# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

EVELYN FAYE HENNING,

          Plaintiff,

vs.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL
SECURITY,

          Defendant.

No. C12-3042-MWB

**REPORT AND
RECOMMENDATION**

_____

    Plaintiff Evelyn Faye Henning seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* ("Act"). Henning contends that the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that she was not disabled. For the reasons that follow, I recommend that the Commissioner's decision be reversed and that this case be remanded for further consideration and findings.

### *Background*

    Henning was born in 1952 and was 56 years old on her alleged onset date of October 6, 2008. AR 13, 20. She obtained a GED in 1971 and has past relevant work as a framer and a medication technician. AR 20, 262. She protectively filed her application for DIB on May 4, 2009. AR 130-36, 198. After that claim was denied, apparently without notice, Henning filed another application on July 31, 2009. AR 137-43. That application was denied initially on September 15, 2009, and denied again on reconsideration. AR 49, 51, 58-61, 68-71. Henning requested a hearing, which

was conducted January 11, 2011, by Administrative Law Judge ("ALJ") Thomas M. Donahue. AR 13. During the hearing, Henning and a vocational expert ("VE") testified. AR 30-43. The ALJ issued a decision denying Henning's application on January 27, 2011. AR 13-22. On May 4, 2012, the Appeals Council denied Henning's request for review. AR 1-3. As such, the ALJ's decision is the final decision of the Commissioner. AR 1; *see also* 20 C.F.R. § 404.981.

On July 2, 2012, Henning commenced an action in this court seeking review of the ALJ's decision. This matter has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case. The parties have briefed the issues and the matter is now fully submitted.

## Summary of Evidence

This case involves two distinct impairments: (1) depression, which the ALJ found to be a severe impairment, and (2) prurigo nodularis, a skin condition that the ALJ deemed to be non-severe. As explained further below, I find that this case must be remanded for further consideration with regard to prurigo nodularis. Thus, while I have reviewed the entire administrative record, I will summarize the evidence only as it relates to that impairment.

### A. Medical Evidence

In March 2008, Henning began developing sores around her eye with erythema and edema. AR 350. By March 13, 2008, this had progressed to a rash with redness and itching. AR 349. On April 7, 2008, Henning was examined for facial edema, pruritus, and popular rash on her neck. AR 347. She stated that the condition started during the night and was growing worse. *Id.*

By May 2008, Henning's rash was on her back, legs, and chest. AR 346. She reported that she had used prednisone as prescribed but then tapered off using it because

2

it caused itching. *Id.* When she stopped using prednisone, the rash returned. *Id.* She was found to have swelling around her right eye, numerous plaques with erythema, scales and crusts on her chest and chin and on her back with excoriations. *Id.* Lynne Senty, D.O., prescribed medication and noted that Henning did not have health insurance. *Id.*

In June 2008, Henning saw dermatologist Tanusin Ploysangam, M.D., who noted that she had scattered erosions and excoriations, except in areas where she could not reach. AR 426. Dr. Ploysangam prescribed various medications over a series of visits. AR 424-26.

In July 2008, Henning saw C. Joseph Plank, M.D., who took biopsies and admonished plaintiff to stop scratching. AR 421-23, 428-29. She saw Dr. Plank again in September 2008. At that time, he concluded that she was suffering from prurigo nodularis and that it was persisting despite using various medications. AR 419. He stated that "[n]one of these measures have made any difference." *Id.* He also stated that because Henning did not have health insurance, she would not be scheduled for another appointment unless it became necessary. *Id.* Instead, she was to call with a report in one month. *Id.*

A mental health record from January 2009 states that Henning had been "diagnosed with a rare skin condition about a year ago." AR 355. The provider noted: "This skin condition started on her face and has now progressed down her body. It causes itching, redness, and bumps that remain. There is no apparent treatment other than a creme [sic] to help relieve itching. This has been very depressing for Evelyn who is embarrassed by this condition. She stated that she never really wore makeup and now she won't go without it to try and cover the redness and bumps." *Id.*

On May 28, 2009, and June 25, 2009, Henning's therapist listed her Axis III[1] diagnosis as prurigo nodularis. AR 359-360. In August and October 2009, the therapist noted that Henning's skin condition was interfering with her getting a job and that Henning was trying to cover the sores with makeup but was still too self-conscious. AR 392-93.

In a letter dated August 20, 2009, Dr. Plank stated he had seen Henning several times from June through September 2008 for prurigo nodularis. AR 363. He stated the condition was "not in any way physically incapacitating," and that he had not seen plaintiff for almost a year. AR 363.

In February 2010, Henning presented to nurse practitioner Kimberly Larson, stating her skin condition was flaring. AR 418. The examination showed some excoriations and excoriated papules. *Id.* Ms. Larson suggested Henning take comfortably warm showers and use lotions, an ointment and a cream. *Id.* In March 2010, Henning reported her skin had "cleared up nicely" with the ointment and cream, but she stopped using it because she had lost Ms. Larson's written instructions. AR 416. Ms. Larson noted Henning's skin was sixty percent improved and she had only a few small nodules remaining. *Id.* Ms. Larson prescribed the ointment and cream, and again wrote down the instructions. *Id.* Ms. Larson advised Henning to return to the clinic if her skin no longer responded to treatment or she had an intense flare. *Id.*

In May 2010, Dr. Senty saw Henning for a recheck of her depression and skin condition. AR 433. She diagnosed depression and a history of neurotic excoriations, and prescribed medication refills for three months. *Id.* In August 2010, Henning

---

[1] Axis III is part of the diagnostic process set forth in the Diagnostic and Statistical Manual of Mental Disorders IV. It is used to indicate "general medical conditions, including diseases or disorders that may be related physiologically to the mental disorder; that are sufficiently severe to affect the patient's mood or functioning; or that influence the choice of medications for treating the mental disorder." MARK MITCHELL ET AL., THE GALE ENCYCLOPEDIA OF MENTAL HEALTH 486 (Kristin Key, ed., 3rd ed. 2012).

canceled an appointment with Dr. Senty due to lack of insurance, but was informed the clinic would allow her to set up payments appropriate for her. AR 433. Henning said she would think about it but also noted she felt better because the humidity had eased. *Id.* In September 2010, Dr. Senty prescribed medication for the skin condition and a cheaper antidepressant medication, and noted she would try to obtain plaintiff's usual antidepressant medication from a program through the drug company. AR 432.

### B. State Agency Medical Consultants

Laura Griffith, D.O., conducted a case analysis dated September 3, 2009. AR 364. She noted that Henning has a history of prurigo nodularis and that Dr. Plank had stated, one year earlier, that the condition was "not incapacitating." *Id.* Dr. Griffith concluded that the condition "is currently non-severe." *Id.*

On October 13, 2009, James Wilson, M.D., endorsed Dr. Griffith's opinion, stating that Henning had not been treated for the skin condition since 2008 and had not been placed under any restrictions by her treating source. AR 382.

### C. Hearing Testimony

#### 1. Claimant's Testimony

At the hearing in January 2011, Henning testified that her skin condition "itches very, very badly" and that she has had "hundreds of sores on me at a time . . . they've been all over my hands and everything and all over my face at times." AR 33. She stated that she "lost all self-esteem and confidence because I, I don't feel like I look good at all anymore." *Id.* She further testified that since 2007, there had not been any periods of time during which she had no sores. AR 34. At the hearing, Henning had visible sores on her arms, hands and face, with other sores on her back, buttocks and legs. *Id.* She also had scarring. *Id.*

Henning testified that there is no cure for her condition and that the only treatment is application of cortisone cream, which she is able to use for only two or three weeks at a time. AR 35. The condition accelerates when she is not able to use the cream. *Id.* She testified that the sores sometimes become infected and that it is very difficult for her to go out in public because of the sores. *Id.* She suffers swelling and pain that limits her ability to be on her feet. AR 36-37. She also testified that having the sores causes her great anxiety and makes her depression worse. AR 37. In addition, she has had difficulty sleeping because of the itching. AR 37-38.

### 2. Vocational Expert's Testimony

The VE found that Henning has past relevant work as a framer and medication technician, with framer being a skilled position (SVP 5) and medication technician being semi-skilled (SVP 4).[2] AR 41, 262. During the hearing, she gave the following answers to hypothetical questions posed by the ALJ:

> Q. First hypothetical would be age 58, a female. She has a, a GED, no exertional limitation, would need an average stress-level job. With this first hypothetical, could she do any of her past relevant work?
>
> A. She could do all of her past relevant work, Your Honor.
>
> Q. Would there be any transferable skills?
>
> A. There would be transferable skills in the ability to operate basic machines, to follow written instructions, to document information, those sort of things.

---

[2] "SVP" refers to Specific Vocational Preparation, defined in Appendix C of the *Dictionary of Occupational Titles* as being "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." A position with an SVP of 4 requires vocational preparation of three to six months while a position with an SVP of 5 requires vocational preparation of six months to one year. *See Dictionary of Occupational Titles,* Appendix C.

Q.      What jobs would that transfer to?

A.      Those skills would transfer to work as a gate guard. That's DOT 372.667.030. There are approximately 1,000 positions in this area, 290,000 nationwide. There would be work as a shipping checker, which is DOT 222.687-030. There are approximately 1200 positions in this area, 400,000 nationwide. And a third example is that of a distributing clerk. That's DOT 222-587-018. There are approximately 11,000 positions in this area, 400,000 nationwide.

Q.      Would there be unskilled work?

A.      There would be unskilled work. Examples would be work as a parking lot attendant. That's DOT 915.473-010. There are approximately 350 positions in this area, 18,000 nationwide. There's work as a ticket taker, DOT 344.667-010. There are approximately 600 positions in this area, 35,000 nationwide. And there would be work as a cashier, DOT 211.462-010. There are approximately 8,000 positions in this area, 900,000 nationwide.

Q.      Second hypothetical would be age 58, female. She has a GED, past relevant work as set forth in 20E, no exertional limitations, would need a lower stress-level job such as a level four, with 10 being most stressful and one being the least stressful, would require a job with no contact with the general public and limited contact with fellow workers. Based on this hypothetical, could the Claimant do her past relevant work?

A.      Based on that, Your Honor, the job as a framer would be possible and the job as a medication technician would be possible as well.

Q.      All right. Would there be transferable skills?

A.      The skills that would transfer would be the same as I had indicated under the first hypothetical.

Q.      All right. Would there be unskilled jobs?

A.      There would. Under that hypothetical, unskilled work would include work as a folder. That's DOT 369.687-018. There are

7

approximately 900 positions in this area, 50,000 nationwide. There would be work as a pricer or a tagger, which is DOT 229.587-018. There are approximately 1,000 positions in this area, 50,000 nationwide. And there would be work as a sterilization clerk, DOT 599.685-018. There are approximately 1200 positions in this area, 62,000 nationwide.

Q.    A third, third hypothetical would be age 58, female. She has a GED, past relevant work as set forth in 20E, no exertional limitations, would need a low stress-level such as four, with ten being the most stressful one being the least stressful, would be limited to simple, routine tasks. Due to depression, mental impairment or any other reason, the Claimant would miss three or more days of work per month. Could the Claimant do her past relevant work under this hypothetical?

A.    No, she could not.

Q.    Would there be transferable skills or unskilled work?

A.    There would not, Your Honor.

AR 41-43.

### Summary of ALJ's Decision

The ALJ made the following findings:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

(2)    The claimant has not engaged in substantial gainful activity since October 6, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

(3)    The claimant has the following severe impairment: depression (20 CFR 404.1520(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part

8

> 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

> (5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she will need a lower stress level job, such as a level four on a scale of one to ten, with one being the least stressful and ten being the most stressful. She will require no contact with the general public and only limited contact with co-workers.

> (6)    The claimant is capable of performing past relevant work as a Framer (DOT 669.662-014, Medium, Skilled) and as a Medication Technician (DOT 355.374-014, Medium per DOT, Heavy per Claimant, Semi-Skilled). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

> (7)    The claimant has not been under a disability, as defined in the Social Security Act, from October 6, 2008, through the date of this decision (20 CFR 404.1520(f)).

AR 13-22. While finding Henning's depression to be a severe impairment, the ALJ found her skin condition, prurigo nodularis, to be non-severe:

> The claimant's [sic] has a documented history of prurigo nodularis, a skin condition. However, this medically determinable impairment does not have more than a minimal effect on the claimant's ability to perform basic work activities. The claimant's treating physician, C. Joseph Plank, M.D., stated that this condition is "not in any way physically incapacitating" and the claimant had not sought care for this condition since September 2008. (Exhibit 9F) Dr. Plank is a treating physician, and great weight has been given to his medical opinion. The claimant later sought care from Mercy Dermatology Center, where her condition responded well to steroid creams. (Exhibit 19F) Nothing in the record suggests that the

claimant has experienced functional limitations that would affect her ability
to perform basic work activities due to this skin condition. As such, the
undersigned finds the medically determinable impairment of prurigo
nodularis to be non-severe based upon the evidence in the record.

AR 15-16. After reaching this conclusion, the ALJ undertook no further analysis of
prurigo nodularis. He did not address the issue of whether that condition meets or
medically equals a listed impairment. AR 16-17. Nor did he address any impact
prurigo nodularis might have on Henning's residual functional capacity ("RFC"). AR
17-20. Instead, he focused on Henning's other impairment, depression, weighing the
medical evidence and Henning's own statements as to the intensity, persistence and
limiting effect of the symptoms caused by that impairment. *Id.* At no point did the
ALJ indicate he was including any impact of prurigo nodularis, whether by itself or in
combination with depression, in his formulation of Henning's RFC. *Id.*

Based on his RFC determination and the VE's opinion testimony, the ALJ found
that Henning is capable of performing her past relevant work as a framer and as a
medication technician. AR 20. He also found that she has acquired work skills that
are transferrable to several other occupations with jobs existing in significant numbers in
the national economy. AR 21. In light of these findings, the ALJ concluded that
Henning is not disabled within the meaning of the Act. AR 22.

### *Disability Determinations and the Burden of Proof*

A disability is defined as the inability to engage in any substantial gainful activity
by reason of any medically determinable physical or mental impairment which can be
expected to result in death or that has lasted or can be expected to last for a continuous
period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20
C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not
only unable to do his previous work but cannot, considering his age, education, and work

10

experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would

have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### *The Substantial Evidence Standard*

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny

benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v.*

*Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## Discussion

Henning raises the following issues:

1.   At step two, the ALJ erred in finding that prurigo nodularis is not a severe impairment.

2.   At step three, the ALJ erred in failing to find that Henning's impairment of prurigo nodularis meets or medically equals a listed impairment.

3.   At steps three and four, the ALJ's formulation of Henning's RFC is not supported by substantial evidence in the record.

4.   A remand for the award benefits is required because the evidence overwhelmingly supports a finding that Henning is disabled.

I will address the first three arguments below.   As for the fourth argument, I agree that remand is necessary but not for the award of benefits.   Instead, I recommend remand for further proceedings as discussed herein.


### 1.   Is Prurigo Nodularis A Severe Impairment?

As noted above, at step two the ALJ must consider whether a medically determinable impairment is "severe."   20 C.F.R. § 404.1520(a)(4)(ii).   A severe impairment is one which "significantly limits your physical or mental ability to do basic work activities."   20 C.F.R. § 404.1520(c).   Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; capacities for seeing, hearing and speaking; understanding, carrying out,

and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. *Page*, 484 F.3d at 1043. It is the claimant's burden to establish that his or her impairment or combination of impairments is severe. *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." *Kirby*, 500 F.3d at 708 (internal citation omitted). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page,* 484 F.3d at 1043 (internal quotation marks omitted).

According to the Commissioner:

> A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself. At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.
>
> . . . .
>
> Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather it should be continued.

SSR 85-28, 1985 WL 56856, at *4 (Jan. 1, 1985). Moreover, Social Security Ruling 96-3p provides:

> Because a determination whether an impairment(s) is severe requires an assessment of the functionally limiting effects of an impairment(s), symptom-related limitations and restrictions must be considered at this step of the sequential evaluation process, provided that the individual has a medically determinable impairment(s) that could reasonably be expected to produce the symptoms.

SSR 96-3p, 1996 WL 374181, at *2 (July 2, 1996). This ruling makes it clear that if a claimant has a medically determinable impairment, the ALJ must also consider the symptom-related limitations and restrictions of that impairment. Finally, Social Security Ruling 96-7p clarifies that the ALJ must consider the claimant's subjective allegations and make a credibility determination at this step.

> Once the adjudicator has determined the extent to which the individual's symptoms limit the individual's ability to do basic work activities by making a finding on the credibility of the individual's statements, the impact of the symptoms on the individual's ability to function must be considered along with the objective medical and other evidence, first in determining whether the individual's impairment or combination of impairments is "severe" at step 2 of the sequential evaluation process for determining disability and, as necessary, at each subsequent step of the process.

SSR 96-7p, 1996 WL 374186 (July 2, 1996).

Here, the ALJ found that Henning's condition of prurigo nodularis is not severe because Dr. Plank (a) gave an opinion that the condition is "not in any way physically incapacitating" and (b) stated that Henning had not sought his care for the condition since September 2008. AR 16. The ALJ also stated that Henning later sought treatment from another source (Mercy Dermatology Center) and that the condition responded well to steroid creams. *Id.* Based on this information, the ALJ concluded that Henning had

not "experienced functional limitations that would affect her ability to perform basic work activities" because of this condition. *Id.*

For several reasons, I agree with Henning that the ALJ's evaluation of her skin condition was so superficial and conclusory that it failed the requirement of "a careful evaluation of the medical findings." *See* SSR 85-28. First, Henning is correct that the ALJ improperly overemphasized Dr. Plank's opinion that the condition is "not in any way physically incapacitating." An ALJ generally must defer to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005). However, a treating physician's conclusion that an applicant is "disabled" or "unable to work" addresses an issue that is reserved for the Commissioner and therefore is not a "medical opinion." *Ellis*, 392 F.3d at 994. Dr. Plank's statement that Henning's skin condition is not "physically incapacitating" is the equivalent of an opinion that it is not "physically disabling." *See, e.g.,* Merriam-Webster Online Dictionary, http://www.merriam-webster.com (last visited May 9, 2013) ("disable" is a synonym of "incapacitate").

If Dr. Plank had stated that Henning is "disabled" (or "incapacitated") because of prurigo nodularis, the ALJ surely (and properly) would have disregarded that opinion as not being a legitimate "medical opinion." Adding the word "not" to the opinion does not convert it into a "medical opinion." Yet the ALJ declared Dr. Plank's statement to be a "medical opinion" and gave it "great weight" in support of a conclusion that prurigo nodularis is not a severe impairment. AR 16. This is inconsistent with the case law and regulations cited above.

Second, an opinion that a condition is not disabling (or "incapacitating") is far different than an opinion that the condition is not "severe." As noted above, "severity"

is not an "onerous requirement." *Kirby*, 500 F.3d at 708. An impairment is "severe" if its limiting effects have "more than a minimal impact" on a claimant's ability to work. *Page,* 484 F.3d at 1043. At best, Dr. Plank's statement indicated that Henning was not entirely disabled because of prurigo nodularis. It did not address the relevant question of whether any limiting effects resulting from that condition had "more than a minimal impact" on Henning's ability to work.

Third, the ALJ's heavy reliance on Dr. Plank's statement seemingly caused him to pay scant attention to other evidence in the record. Dr. Plank had last seen Henning in 2008, two years before the hearing, and wrote his statement more than one year before the hearing. AR 13, 363. As discussed above, the record contains medical evidence concerning Henning's ongoing experience with prurigo nodularis between 2008 and the date of the hearing. AR 355, 359-60, 392-93, 416, 418, 432-33. In concluding that Henning's skin condition was not severe, the ALJ made only passing reference to this additional evidence, specifically citing Exhibit 19F. AR 16. He summarized the records contained in that exhibit by stating Henning "later sought care from Mercy Dermatology Center, where her condition responded well to steroid creams." AR 16. A review of those records shows that this is, at best, an overgeneralization.

For example, records from February 2010 indicate Henning had been using Triamcinolone but inquired as to whether she could try something else, as her skin condition was "flaring" and "itches intensively." AR 418. She was found to have crusted excoriations on her forehead and the side of her face, along with light violaceous excoriated papules on her forearms and lower extremities. *Id.* She was advised to try two different creams, but reported several weeks later that her forehead was "somewhat worse" while other areas were "somewhat improved, but not completely cleared." AR 417. At that time, Henning asked if there was a "next step for treatment." *Id.* When she was seen in March 2010, her skin had "cleared up nicely." AR 416. However,

another record indicates that she was having problems again in September 2010. AR 432. It is not accurate to state that the post-2008 records show Henning's condition "responded well" to treatment.

Fourth, it appears that the ALJ failed to undertake the required analysis of Henning's credibility regarding her statements as to the limiting effects of her skin condition. In determining the severity of a medically determinable impairment, the ALJ must consider a claimant's symptom-related limitations and make a credibility finding on his or her alleged limitations. *See Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001) (the ALJ erred at step two by failing to evaluate the claimant's subjective complaints); *see also* SSR 96-7p, 1996 WL 374186 (July 2, 1996). While the ALJ may have concluded that the medical evidence does not support Henning's subjective allegations concerning prurigo nodularis, this is only one factor that should be considered. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) ("The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints."). The ALJ is required to explicitly discredit a claimant and provide reasons. *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) ("[A]n ALJ who rejects such [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints.").

As noted above, Henning testified about the limiting effects of prurigo nodularis during the hearing. AR 33-38. The ALJ did not expressly address those statements in his step two analysis. Moreover, while he did address Henning's credibility during the step four analysis, it appears that he did so only with regard to her statements concerning her mental health condition. AR 17-19. Indeed, at step four he mentioned prurigo nodularis only to state that this condition had been "discussed above." AR 17. He

then addressed Henning's "mental health symptoms" and analyzed her credibility with regard to those symptoms.    AR 17-19.

In short, I find that in determining whether Henning's skin condition was a severe impairment, the ALJ failed to conduct the required "careful evaluation" of the medical findings.   He committed clear legal error by treating Dr. Plank's statement as a "medical opinion" entitled to great weight.   He then proceeded as if that statement all but slammed the door on the "severity" issue.   As such, he did not address the credibility of Henning's statements and provided very little analysis of the other evidence in the record.

I further find that remand, not reversal, is the appropriate remedy, as I am unable to conclude that the record overwhelmingly supports an immediate finding of disability. *See Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000).   On remand, the ALJ shall revisit step two.   He must analyze the medical evidence without treating Dr. Plank's August 20, 2009, statement as a "medical opinion" that is entitled to great weight.   He shall also conduct the required credibility analysis with regard to Henning's statements concerning the limiting effects of prurigo nodularis.   He shall then determine whether Henning's condition of prurigo nodularis is a severe impairment within the meaning of the Commissioner's regulations and rulings.

### 2.    *Does Henning's skin condition meet or medically equal a listed impairment?*

Henning argues the ALJ erred at step three by failing to find that her condition of prurigo nodularis meets or equals a listed impairment.   She notes that the ALJ did not expressly consider the skin disorders described under Listing 8.00, entitled "Skin Disorders – Adult." *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, 8.00.   She then contends that she meets the threshold requirements described in Listing 8.00 and that

there is not substantial evidence in the record to support a finding that she does not meet or medically equal the requirements of Listing 8.04, which states:

> **8.04 Chronic infections of the skin or mucous membranes**, with extensive fungating or extensive ulcerating skin lesions that persist for at least 3 months despite continuing treatment as prescribed.

20 C.F.R. Part 404, Subpart P, Appendix 1, 8.04.

The fact that the ALJ did not expressly reference Listings 8.00 and 8.04 does not, by itself, constitute error. *See, e.g., Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) ("There is no error when an ALJ fails to explain why an impairment does not [meet or] equal one of the listed impairments as long as the overall conclusion is supported by the record."). Nonetheless, based on my review of the record and the listings referenced above, I find that Henning has raised a colorable issue as to whether she should be presumed disabled based on Listings 8.00 and 8.04. Because I have determined, *supra*, that it is necessary to recommend remand, I will direct the ALJ to consider, and make express findings on, the issue of whether Henning meets or medically equals Listings 8.00 and 8.04.

### 3.    Does substantial evidence support the ALJ's determination of Henning's RFC?

Henning contends the ALJ's determination of her RFC is not supported by substantial evidence in the record as a whole. Because I am recommending remand with regard to the step two and step three analyses, it is premature to conduct a detailed analysis of the ALJ's RFC determination at this time. However, there are two areas of concern that the ALJ should consider and address on remand.

First, in determining Henning's RFC the ALJ did not expressly state that he was considering all of Henning's impairments, whether severe or non-severe. The regulations state: "We will consider all of your medically determinable impairments of

which we are aware, including your medically determinable impairments that are not 'severe' . . . when we assess your residual functional capacity." 20 C.F.R. § 404.1525(a)(2). The ALJ found Henning's skin condition to be a medically determinable impairment, AR 15, but did not expressly take that condition into account in his analysis of Henning's RFC. AR 17-20. Indeed, he seemingly dismissed any consideration of that condition by noting that he had addressed it earlier, in his step two analysis. AR 17.

Second, and relatedly, the ALJ did not indicate that he was taking into account the combination of all of Henning's impairments, both severe and non-severe, in formulating her RFC. The regulations state:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523. While the ALJ may have considered the combined effect of all impairments, this is not clear from his decision. Henning's testimony and the medical evidence suggest that she asserts a connection between prurigo nodularis and depression. That is, she believes the chronic presence of visible sores exacerbates the symptoms she suffers from depression. Even if prurigo nodularis is not, by itself, a severe impairment, the ALJ must consider its effects in combination with the effects of depression.

On remand, and regardless of whether he determines prurigo nodularis to be a severe or non-severe impairment, the ALJ should address the impact of this impairment on Henning's RFC, both by itself and in combination with Henning's mental impairment.

### *Conclusion and Recommendation*

For the reasons discussed above, I RESPECTFULLY RECOMMEND that the Commissioner's decision be **reversed** and this case be **remanded** for further proceedings consistent with this report. Judgment should be entered in favor of Henning and against the Commissioner.

On remand, the ALJ should:

1)    At step two, conduct a new analysis to determine if Henning's condition of prurigo nodularis is a severe impairment. In conducting that analysis, he should (a) not treat Dr. Plank's August 20, 2009, statement as a "medical opinion" that is entitled to great weight and (b) conduct a credibility analysis with regard to Henning's statements concerning the limiting effects of prurigo nodularis.

2)    At step three, consider and make express findings on the issue of whether Henning's condition of prurigo nodularis meets or medically equals Listings 8.00 and 8.04.

3)    At step four, conduct a new analysis of Henning's RFC that takes into account any changes that arise from the new step two analysis while also expressly addressing the impact of prurigo nodularis on Henning's RFC, both separately and in combination with Henning's mental impairment.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the

right to appeal from the findings of fact contained therein.  *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 9th day of May, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA