IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

EVELYN FAYE HENNING,

Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

Defendant.

No. C 12-3042-MWB

MEMORANDUM OPINION AND
ORDER REGARDING REPORT AND
RECOMMENDATION

---

**TABLE OF CONTENTS**

I.  **INTRODUCTION**.............................................................................2
    A.  *Procedural Background* ..........................................................2
    B.  *Factual Background* ...............................................................3
        1.  *Summary of the evidence* ................................................3
            a.  *Medical evidence* ...................................................3
            b.  *State agency medical consultants* ..............................6
            c.  *Hearing testimony* .................................................6
                i.  *Henning's testimony* ......................................6
                ii. *Vocational expert's testimony* ..........................7
        2.  *Summary of the ALJ's decision* .....................................10
    C.  *Judge Strand's Recommendation*...........................................12

II. **ANALYSIS** ................................................................................15
    A.  *Standard of Review*..............................................................15
    B.  *Defendant's Objections* ........................................................21

III. **CONCLUSION** ...........................................................................25

This case is before me on a Report And Recommendation (R&R) (docket no. 15) from Magistrate Judge Leonard Strand recommending that I reverse and remand the Social Security Commissioner's (the Commissioner's) decision to deny Plaintiff Evelyn

Henning (Henning) disability insurance benefits (DIB) under Title II of the Social Security Act. On May 23, 2013, Defendant filed objections to the R&R, requesting that I affirm the Commissioner's decision (docket no. 16). Henning did not file a response to Defendant's objections. For the reasons discussed below, I accept Judge Strand's R&R, and I remand this case for further proceedings.

## I. INTRODUCTION

### A. Procedural Background

In this case, Henning seeks disability benefits based on two claimed impairments: depression and prurigo nodularis, a skin condition. In his R&R, Judge Strand summarized this case's procedural background:

> Henning was born in 1952 and was 56 years old on her alleged onset date of October 6, 2008. AR 13, 20. She obtained a GED in 1971 and has past relevant work as a framer and a medication technician. AR 20, 262. She protectively filed her application for DIB on May 4, 2009. AR 130-36, 198. After that claim was denied, apparently without notice, Henning filed another application on July 31, 2009. AR 137-43. That application was denied initially on September 15, 2009, and denied again on reconsideration. AR 49, 51, 58-61, 68-71. Henning requested a hearing, which was conducted [on] January 11, 2011, by Administrative Law Judge ("ALJ") Thomas M. Donahue. AR 13. During the hearing, Henning and a vocational expert ("VE") testified. AR 30-43. The ALJ issued a decision denying Henning's application on January 27, 2011. AR 13-22. On May 4, 2012, the Appeals Council denied Henning's request for review. AR 1-3. As such, the ALJ's decision is the final decision of the Commissioner. AR 1; see also 20 C.F.R. § 404.981.

Report And Recommendation 1-2 (docket no. 15). On July 10, 2012, Henning filed an action in this court seeking judicial review of the ALJ's decision (docket no. 3). I referred this case to Judge Strand on December 11, 2012.

On May 9, 2013, Judge Strand issued his R&R, recommending that I reverse and remand the ALJ's decision denying Henning benefits (docket no. 15). On May 23, 2013, Defendant objected to Judge Strand's recommendation, arguing that I should affirm the ALJ's decision (docket no. 16). I must now decide whether to accept or reject Judge Strand's R&R in light of Defendant's objections.

### B.    *Factual Background*

In his R&R, Judge Strand made thorough findings of fact. Report And Recommendation 2-8 (docket no. 15). While Defendant objects to Judge Strand's analysis and legal conclusion, Defendant does not object to Judge Strand's factual findings. I therefore adopt the findings of fact from the R&R, which are set forth below.

### 1.    *Summary of the evidence*

This case involves two distinct impairments:   (1) depression, which the ALJ found to be a severe impairment, and (2) prurigo nodularis, a skin condition that the ALJ deemed to be non-severe. As explained further below, I find that this case must be remanded for further consideration with regard to prurigo nodularis. Thus, while I have reviewed the entire administrative record, I will summarize the evidence only as it relates to that impairment.

### a.    *Medical evidence*

In March 2008, Henning began developing sores around her eye with erythema and edema. AR 350. By March 13, 2008, this had progressed to a rash with redness and itching. AR 349. On April 7, 2008, Henning was examined for facial edema, pruritus, and popular rash on her neck. AR 347. She stated that the condition started during the night and was growing worse. *Id.*

By May 2008, Henning's rash was on her back, legs, and chest. AR 346. She reported that she had used prednisone as prescribed but then tapered off using it

because it caused itching. *Id.* When she stopped using prednisone, the rash returned. *Id.* She was found to have swelling around her right eye, numerous plaques with erythema, scales and crusts on her chest and chin and on her back with excoriations. *Id.* Lynne Senty, D.O., prescribed medication and noted that Henning did not have health insurance. *Id.*

In June 2008, Henning saw dermatologist Tanusin Ploysangam, M.D., who noted that she had scattered erosions and excoriations, except in areas where she could not reach. AR 426. Dr. Ploysangam prescribed various medications over a series of visits. AR 424-26.

In July 2008, Henning saw C. Joseph Plank, M.D., who took biopsies and admonished plaintiff to stop scratching. AR 421-23, 428-29. She saw Dr. Plank again in September 2008. At that time, he concluded that she was suffering from prurigo nodularis and that it was persisting despite using various medications. AR 419. He stated that "[n]one of these measures have made any difference." *Id.* He also stated that because Henning did not have health insurance, she would not be scheduled for another appointment unless it became necessary. *Id.* Instead, she was to call with a report in one month. *Id.*

A mental health record from January 2009 states that Henning had been "diagnosed with a rare skin condition about a year ago." AR 355. The provider noted: "This skin condition started on her face and has now progressed down her body. It causes itching, redness, and bumps that remain. There is no apparent treatment other than a creme [sic] to help relieve itching. This has been very depressing for Evelyn who is embarrassed by this condition. She stated that she never really wore makeup and now she won't go without it to try and cover the redness and bumps." *Id.*

On May 28, 2009, and June 25, 2009, Henning's therapist listed her Axis III[1] diagnosis as prurigo nodularis. AR 359-360. In August and October 2009, the therapist noted that Henning's skin condition was interfering with her getting a job and that Henning was trying to cover the sores with makeup but was still too self-conscious. AR 392-93.

In a letter dated August 20, 2009, Dr. Plank stated he had seen Henning several times from June through September 2008 for prurigo nodularis. AR 363. He stated the condition was "not in any way physically incapacitating," and that he had not seen plaintiff for almost a year. AR 363.

In February 2010, Henning presented to nurse practitioner Kimberly Larson, stating her skin condition was flaring. AR 418. The examination showed some excoriations and excoriated papules. *Id*. Ms. Larson suggested Henning take comfortably warm showers and use lotions, an ointment and a cream. *Id*. In March 2010, Henning reported her skin had "cleared up nicely" with the ointment and cream, but she stopped using it because she had lost Ms. Larson's written instructions. AR 416. Ms. Larson noted Henning's skin was sixty percent improved and she had only a few small nodules remaining. *Id*. Ms. Larson prescribed the ointment and cream, and again wrote down the instructions. *Id*. Ms. Larson advised Henning to return to the clinic if her skin no longer responded to treatment or she had an intense flare. *Id*.

In May 2010, Dr. Senty saw Henning for a recheck of her depression and skin condition. AR 433. She diagnosed depression and a history of neurotic excoriations,

---

[1] Axis III is part of the diagnostic process set forth in the Diagnostic and Statistical Manual of Mental Disorders IV. It is used to indicate "general medical conditions, including diseases or disorders that may be related physiologically to the mental disorder; that are sufficiently severe to affect the patient's mood or functioning; or that influence the choice of medications for treating the mental disorder." MARK MITCHELL ET AL., THE GALE ENCYCLOPEDIA OF MENTAL HEALTH 486 (Kristin Key, ed., 3rd ed. 2012).

and prescribed medication refills for three months. *Id.* In August 2010, Henning canceled an appointment with Dr. Senty due to lack of insurance, but was informed the clinic would allow her to set up payments appropriate for her. AR 433. Henning said she would think about it but also noted she felt better because the humidity had eased. *Id.* In September 2010, Dr. Senty prescribed medication for the skin condition and a cheaper antidepressant medication, and noted she would try to obtain plaintiff's usual antidepressant medication from a program through the drug company. AR 432.

### b.    *State agency medical consultants*

Laura Griffith, D.O., conducted a case analysis dated September 3, 2009. AR 364. She noted that Henning has a history of prurigo nodularis and that Dr. Plank had stated, one year earlier, that the condition was "not incapacitating." *Id.* Dr. Griffith concluded that the condition "is currently non-severe." *Id.*

On October 13, 2009, James Wilson, M.D., endorsed Dr. Griffith's opinion, stating that Henning had not been treated for the skin condition since 2008 and had not been placed under any restrictions by her treating source. AR 382.

### c.    *Hearing testimony*

#### i.    *Henning's testimony*

At the hearing in January 2011, Henning testified that her skin condition "itches very, very badly" and that she has had "hundreds of sores on me at a time . . . they've been all over my hands and everything and all over my face at times." AR 33. She stated that she "lost all self-esteem and confidence because I, I don't feel like I look good at all anymore." *Id.* She further testified that since 2007, there had not been any periods of time during which she had no sores. AR 34. At the hearing, Henning had visible sores on

her arms, hands and face, with other sores on her back, buttocks and legs. *Id.* She also had scarring. *Id.*

Henning testified that there is no cure for her condition and that the only treatment is application of cortisone cream, which she is able to use for only two or three weeks at a time. AR 35. The condition accelerates when she is not able to use the cream. *Id.* She testified that the sores sometimes become infected and that it is very difficult for her to go out in public because of the sores. *Id.* She suffers swelling and pain that limits her ability to be on her feet. AR 36-37. She also testified that having the sores causes her great anxiety and makes her depression worse. AR 37. In addition, she has had difficulty sleeping because of the itching. AR 37-38.

### ii.    *Vocational expert's testimony*

The VE found that Henning has past relevant work as a framer and medication technician, with framer being a skilled position (SVP 5) and medication technician being semi-skilled (SVP 4).[2] AR 41, 262. During the hearing, she gave the following answers to hypothetical questions posed by the ALJ:

> Q.    First hypothetical would be age 58, a female. She has a, a GED, no exertional limitation, would need an average stress-level job. With this first hypothetical, could she do any of her past relevant work?

> A.    She could do all of her past relevant work, Your Honor.

---

[2] "SVP" refers to Specific Vocational Preparation, defined in Appendix C of the *Dictionary of Occupational Titles* as being "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." A position with an SVP of 4 requires vocational preparation of three to six months while a position with an SVP of 5 requires vocational preparation of six months to one year. *See Dictionary of Occupational Titles,* Appendix C.

Q.     Would there be any transferable skills?

A.     There would be transferable skills in the ability to operate basic machines, to follow written instructions, to document information, those sort of things.

Q.     What jobs would that transfer to?

A.     Those skills would transfer to work as a gate guard. That's DOT 372.667.030. There are approximately 1,000 positions in this area, 290,000 nationwide. There would be work as a shipping checker, which is DOT 222.687-030. There are approximately 1200 positions in this area, 400,000 nationwide. And a third example is that of a distributing clerk. That's DOT 222-587-018. There are approximately 11,000 positions in this area, 400,000 nationwide.

Q.     Would there be unskilled work?

A.     There would be unskilled work. Examples would be work as a parking lot attendant. That's DOT 915.473-010. There are approximately 350 positions in this area, 18,000 nationwide. There's work as a ticket taker, DOT 344.667-010. There are approximately 600 positions in this area, 35,000 nationwide. And there would be work as a cashier, DOT 211.462-010. There are approximately 8,000 positions in this area, 900,000 nationwide.

Q.     Second hypothetical would be age 58, female. She has a GED, past relevant work as set forth in 20E, no exertional limitations, would need a lower stress-level job such as a level four, with 10 being most stressful and one being the least stressful, would require a job with no contact with the general public and limited contact with fellow workers. Based on this hypothetical, could the Claimant do her past relevant work?

A.     Based on that, Your Honor, the job as a framer would be possible and the job as a medication technician would be possible as well.

Q.     All right. Would there be transferable skills?

A.     The skills that would transfer would be the same as I had indicated under the first hypothetical.

Q.     All right. Would there be unskilled jobs?

A.     There would. Under that hypothetical, unskilled work would include work as a folder. That's DOT 369.687-018. There are approximately 900 positions in this area, 50,000 nationwide. There would be work as a pricer or a tagger, which is DOT 229.587-018. There are approximately 1,000 positions in this area, 50,000 nationwide. And there would be work as a sterilization clerk, DOT 599.685-018. There are approximately 1200 positions in this area, 62,000 nationwide.

Q.     A third, [] hypothetical would be age 58, female. She has a GED, past relevant work as set forth in 20E, no exertional limitations, would need a low stress-level such as four, with ten being the most stressful one being the least stressful, would be limited to simple, routine tasks. Due to depression, mental impairment or any other reason, the Claimant would miss three or more days of work per month. Could the Claimant do her past relevant work under this hypothetical?

A.     No, she could not.

Q.     Would there be transferable skills or unskilled work?

A.     There would not, Your Honor.

AR 41-43.

## 2.  *Summary of the ALJ's decision*

The ALJ made the following findings:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

(2)    The claimant has not engaged in substantial gainful activity since October 6, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

(3)    The claimant has the following severe impairment: depression (20 CFR 404.1520(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she will need a lower stress level job, such as a level four on a scale of one to ten, with one being the least stressful and ten being the most stressful.  She will require no contact with the general public and only limited contact with co-workers.

(6)    The claimant is capable of performing past relevant work as a Framer (DOT 669.662-014, Medium, Skilled) and as a Medication Technician (DOT 355.374-014, Medium per DOT, Heavy per Claimant, Semi-Skilled). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

(7)     The claimant has not been under a disability, as defined in the Social Security Act, from October 6, 2008, through the date of this decision (20 CFR 404.1520(f)).

AR 13-22.   While finding Henning's depression to be a severe impairment, the ALJ found her skin condition, prurigo nodularis, to be non-severe:

> The claimant's [sic] has a documented history of prurigo nodularis, a skin condition. However, this medically determinable impairment does not have more than a minimal effect on the claimant's ability to perform basic work activities. The claimant's treating physician, C. Joseph Plank, M.D., stated that this condition is "not in any way physically incapacitating" and the claimant had not sought care for this condition since September 2008. (Exhibit 9F) Dr. Plank is a treating physician, and great weight has been given to his medical opinion. The claimant later sought care from Mercy Dermatology Center, where her condition responded well to steroid creams. (Exhibit 19F) Nothing in the record suggests that the claimant has experienced functional limitations that would affect her ability to perform basic work activities due to this skin condition. As such, the undersigned finds the medically determinable impairment of prurigo nodularis to be non-severe based upon the evidence in the record.

AR 15-16.

. . .

Based on his RFC determination and the VE's opinion testimony, the ALJ found that Henning is capable of performing her past relevant work as a framer and as a medication technician.  AR 20.  He also found that she has acquired work skills that are transferrable to several other occupations with jobs existing in significant numbers in the national economy.  AR 21.  In light of these findings, the

ALJ concluded that Henning is not disabled within the meaning of the Act. AR 22.

### C.   *Judge Strand's Recommendation*

Judge Strand reviewed the ALJ's decision to deny Henning disability benefits and recommended that I remand this case to the Commissioner to fix a number of defects in the ALJ's decision. The proposed defects all relate to the ALJ's conclusions regarding Henning's skin condition, prurigo nodularis. In particular, Judge Strand found that the ALJ erred in determining that Henning's prurigo nodularis was not a severe impairment, which is Step 2 in the ALJ's analysis. According to Judge Strand, "the ALJ's evaluation of [Henning's] skin condition was so superficial and conclusory that it" could not be considered "a careful evaluation of the medical findings." Report And Recommendation 18 (docket no. 15); *see also* SSR 85-28, 1985 WL 56856, at *4 (Jan. 1, 1985) (noting in a Commissioner's policy statement that "[a] determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s)").

Judge Strand identified a number of defects in the ALJ's conclusion that Henning's prurigo nodularis was not a severe impairment. First, Judge Strand held that the ALJ improperly relied on Dr. Plank's opinion that Henning's prurigo nodularis is "not in any way physically incapacitating." Judge Strand found that Dr. Plank's opinion was not a "medical opinion," but rather a conclusion that Henning was not disabled, which is a conclusion only an ALJ can make. *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."). Because Dr. Plank's opinion was not a "medical opinion," Judge Strand held that the ALJ improperly gave Dr. Plank's opinion "great weight."

Second, Judge Strand held that Dr. Plank's opinion that Henning's prurigo nodularis was not "incapacitating" did not speak to whether Henning's prurigo nodularis was nonetheless "severe." To be considered "severe," Henning's impairment must simply have "more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotations omitted). Judge Strand noted that an impairment may not be "incapacitating," but may still have more than a minimal impact on a claimant's ability to work. Thus, he concluded that the ALJ denied Henning benefits without addressing the relevant question of whether Henning's prurigo nodularis had more than a minimal impact on her ability to work.

Third, Judge Strand held that the ALJ's reliance on Dr. Plank's opinion likely caused the ALJ to pay too little attention to other record evidence. For example, Judge Strand found that "the ALJ made only passing reference" to medical evidence discussing Henning's ongoing problems with prurigo nodularis *after* Dr. Plank stopped treating her in 2008. Report And Recommendation 19 (docket no. 15). The ALJ did note that Henning's post-2008 records showed that her prurigo nodularis "responded well to steroid creams." Judge Strand found that this characterization was, "at best, an overgeneralization." *Id.* Judge Strand summarized the evidence contradicting the ALJ's conclusion:

> [R]ecords from February 2010 indicate Henning had been using Triamcinolone but inquired as to whether she could try something else, as her skin condition was "flaring" and "itches intensively." AR 418. She was found to have crusted excoriations on her forehead and the side of her face, along with light violaceous excoriated papules on her forearms and lower extremities. *Id.* She was advised to try two different creams, but reported several weeks later that her forehead was "somewhat worse" while other areas were "somewhat improved, but not completely cleared." AR 417. At that time, Henning asked if there was a "next step for treatment." *Id.* When she was seen in March 2010, her

> skin had "cleared up nicely." AR 416. However, another
> record indicates that she was having problems again in
> September 2010. AR 432.

Report And Recommendation 19-20 (docket no. 15). Based on this evidence, Judge Strand held that the ALJ could not accurately conclude that Henning's condition responded well to treatment.

Finally, Judge Strand noted that the ALJ failed to conduct an analysis of Henning's credibility. "[A]n ALJ must *explicitly* discredit a claimant and give reasons" for doing so. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001) (emphasis added). At her hearing, Henning testified about the limiting effects that her prurigo nodularis had on her life. The ALJ never explicitly addressed the credibility of Henning's testimony regarding prurigo nodularis. The ALJ did, however, address Henning's credibility later, during Step 4 of his analysis. But even then, the ALJ did not address Henning's statements about her physical skin condition, only her mental impairment.

Judge Strand also found that the ALJ's failures at Step 2 affected the ALJ's conclusions at Steps 3 and 4. For example, because Judge Strand found that the ALJ had not properly evaluated Henning's prurigo nodularis at Step 2, the ALJ did not compare Henning's skin condition to those in Listings 8.00 and 8.04 in Title 20 of the Code of Federal Regulations, Part 404, Subpart P, Appendix 1. Judge Strand recommended that, on remand, the ALJ should compare Henning's condition to those Listings to determine if Henning is presumed disabled under the Code. Judge Strand also noted that, because he recommended that the case be remanded, it was premature to conduct a detailed analysis of the ALJ's RFC determination. But, Judge Strand pointed out two areas of concern: (1) the ALJ failed to state whether he considered both Henning's severe and non-severe impairments in his RFC determination; and (2) the ALJ failed to mention whether he took into account the combination of Henning's

impairments when making his RFC determination. Judge Strand recommended that the ALJ address these concerns on remand.

In sum, Judge Strand recommended that this case be remanded with the following instructions to the ALJ:

> 1)     At step two, conduct a new analysis to determine if Henning's condition of prurigo nodularis is a severe impairment. In conducting that analysis, he should (a) not treat Dr. Plank's August 20, 2009, statement as a "medical opinion" that is entitled to great weight and (b) conduct a credibility analysis with regard to Henning's statements concerning the limiting effects of prurigo nodularis.
>
> 2)     At step three, consider and make express findings on the issue of whether Henning's condition of prurigo nodularis meets or medically equals Listings 8.00 and 8.04.
>
> 3)     At step four, conduct a new analysis of Henning's RFC that takes into account any changes that arise from the new step two analysis while also expressly addressing the impact of prurigo nodularis on Henning's RFC, both separately and in combination with Henning's mental impairment.

Report And Recommendation 24 (docket no. 15). I must now decide whether to accept or reject Judge Strand's recommendations in light of Defendant's objections.

## II.     ANALYSIS

### A.     Standard of Review

I review Judge Strand's R&R under the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or

15

recommit the matter to the magistrate judge with instructions.

28. U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. Ia. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review *de novo* any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential review"). The *de novo* review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to

16

which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's *required de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any issue need only ask."). Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has been willing to "liberally construe[]" otherwise general pro se objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise. *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, I

will strive to provide *de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed). The United States Supreme Court has stated that the "foremost" principle under the "clearly erroneous" standard of review "is that '[a] finding is "clearly erroneous" when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads me to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; see also Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, I believe one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and I may choose to apply a less deferential standard.[3]

---

[3] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the

Here, Defendant has objected to some of Judge Strand's findings. Although I will review these findings *de novo*, and Judge Strand's other findings for clear error, I review the Commissioner's decision to determine whether the correct legal standards were applied and "whether the Commissioner's findings are supported by substantial evidence in the record as a whole." *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999)). Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." (quoting *Haggard*, 175 F.3d at 594)). "If, after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the

---

plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings. *See Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will not result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

Commissioner's findings, [the court] must affirm the denial of benefits." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996)). Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'" *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

## B.    *Defendant's Objections*

Defendant raises a number of objections to Judge Strand's recommendation to remand this case to the Commissioner. But most, if not all, of Defendant's objections miss the boat in terms of Judge Strand's recommendation. Judge Strand did not find that the ALJ's decision lacked substantial evidence. He did not recommend that I award Henning benefits. Rather, Judge Strand's criticisms of the ALJ's decision were largely procedural, not substantive. Judge Strand mainly took issue with *how* the ALJ analyzed the evidence and *how* the ALJ supported (or failed to support) his conclusion:

> In short, I find that in determining whether Henning's skin condition was a severe impairment, the ALJ failed to conduct the required "careful evaluation" of the medical findings. He committed clear legal error by treating Dr. Plank's statement as a "medical opinion" entitled to great weight. He then proceeded as if that statement all but slammed the door on the "severity" issue. As such, he did not address the credibility of Henning's statements and provided very little analysis of the other evidence in the record.

Report And Recommendation 21 (docket no. 15). Judge Strand offered no conclusion on whether substantial evidence supported or refuted Henning's claim for benefits.

But, in response to Judge Strand's procedural recommendations, Defendant offers substantive objections. Defendant does not clearly enumerate these objections

anywhere in her brief, but as far as I can tell Defendant makes the following arguments:

> (1) "[Henning] has the burden, not the ALJ, to show she has specific *work-related limitations* from her skin condition, and substantial evidence supports the ALJ's finding that [Henning] did not meet this burden." (docket no. 16, at 3)

> (2) The ALJ "appropriately referenced [Henning's] post-2008 treatment" because "[t]he record showed that [Henning] experienced occasional flares of [her skin] condition, but that treatment was generally effective." (docket no. 16, at 3)

> (3) "[B]ecause the ALJ appropriately found [Henning] had not shown her skin condition was severe . . . the condition cannot rise to the level of a disabling impairment at step three of the sequential evaluation (the Listings)." (docket no. 16, at 4)

> (4) "Because the ALJ found no significant work-related limitations due to the skin condition, which was non-severe, no additional limitations were required to be included in the RFC." (docket no. 16, at 5)

> (5) "[T]he ALJ referenced [Henning's] allegations of disability due to prurigo nodularis at [step four], showing he did in fact consider all [Henning's] impairments, including the skin condition, when finding RFC . . . ." (docket no. 16, at 5)

None of these objections actually take issue with Judge Strand's recommendation to remand this case for further proceedings. Objection (1)—that substantial evidence supports the ALJ's decision regarding Henning's skin condition—may be true, but it is premature. Judge Strand did not find that the ALJ's decision lacked substantial evidence, nor did he suggest that substantial evidence supports Henning's claim. *See* Report And Recommendation 21 (docket no. 15) ("I am unable to conclude that the

record overwhelmingly supports an immediate finding of disability."). Rather, he recommended that I remand this case so the ALJ could fix his currently incomplete analysis—namely by determining whether Henning's skin condition is a severe impairment without relying on Dr. Plank's improper opinion.

Here, the ALJ's nearly wholesale reliance on Dr. Plank's opinion that Henning's skin condition was not "incapacitating" rendered the ALJ's analysis incomplete, and, at times, inaccurate. The incompleteness and inaccuracy stem from the same problem: The ALJ, in effect, substituted Dr. Plank's opinion that Henning was not disabled for his own. By doing so, the ALJ (1) failed to meaningfully consider Henning's post-2008 treatment history and (2) ignored the fact that Henning's impairment may be "severe" even if it is not "incapacitating." In short, the ALJ simply did not conduct a careful evaluation of the medical evidence. "While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand." *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (quoting *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000); *Boyd v. Sullivan*, 960 F.2d 733, 736 (8th Cir. 1992)) (internal quotation marks omitted).

Importantly, Defendant does not object to Judge Strand's conclusions that (1) Dr. Plank's opinion was not a true "medical opinion" and was therefore not entitled to great weight, (2) that an impairment can be severe without being incapacitating, and (3) that the ALJ never performed the required analysis of Henning's credibility in testifying about her skin condition. Upon an independent review of the ALJ's decision, I agree with these three conclusions. These three conductions relate to the same defect in the ALJ's decision; the ALJ simply sidestepped the most important question at Step 2—the question of whether Henning's prurigo nodularis is severe. That is a question for the

ALJ, and I may not independently weigh the evidence in the first instance to render my own opinion on whether Henning's skin condition is severe. *See Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007) ("[I]t is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue[s] . . . *de novo*." (quotations omitted)). Maybe the ALJ ultimately reached the correct conclusion, maybe not. Either way, the ALJ cannot skip over—even inadvertently—the question of whether Henning's skin condition is severe. Thus, for the reasons stated above, Objection (1) is really no objection at all, at least not at this stage.

Turning to Defendant's other objections, Objection (2)—that Henning's records show that her post-2008 treatment was generally effective—suffers from the same problems as Objection (1). It defends a conclusion that may be true, but that the ALJ nonetheless never properly reached. The ALJ's consideration of the medical evidence was tainted by the ALJ's improper reliance on Dr. Plank's opinion. As Judge Strand pointed out, the ALJ never analyzed the medical evidence suggesting that Henning's post-2008 treatment was *not* generally effective:

> [R]ecords from February 2010 indicate Henning had been using Triamcinolone but inquired as to whether she could try something else, as her skin condition was "flaring" and "itches intensively." AR 418. She was found to have crusted excoriations on her forehead and the side of her face, along with light violaceous excoriated papules on her forearms and lower extremities. Id. She was advised to try two different creams, but reported several weeks later that her forehead was "somewhat worse" while other areas were "somewhat improved, but not completely cleared." AR 417. At that time, Henning asked if there was a "next step for treatment." Id. When she was seen in March 2010, her skin had "cleared up nicely." AR 416. However, another record indicates that she was having problems again in September 2010. AR 432.

Report And Recommendation 19-20 (docket no. 15). From this evidence, the ALJ simply concluded: "[Henning's] condition responded well to steroid creams." I agree with Judge Strand; the ALJ's statement is, at best, an overgeneralization. Thus, remand is appropriate so that the ALJ has an opportunity to consider the medical evidence without giving great weight to Dr. Plank's opinion that Henning was not incapacitated by her skin condition.

Objections (3), (4), and (5) all assume, as a premise, that the ALJ correctly concluded that Henning's skin condition was not severe. As I explained above, that premise is the very reason this case should be remanded, so that the ALJ can properly evaluate whether Henning's skin condition is severe. Judge Strand correctly noted: "Because I am recommending remand with regard to the step two and step three analyses, it is premature to conduct a detailed analysis of the ALJ's RFC determination at this time." Report And Recommendation 22 (docket no. 15). Thus, to the extent Defendant has objections to the ALJ's RFC determination, those objections are premature.

### III. CONCLUSION

Upon my independent review of the record, I find that Judge Strand correctly concluded that the ALJ failed to properly analyze whether Henning's skin condition was "severe." This failure at Step 2 in the ALJ's analysis infected the ALJ's conclusions at Steps 3 and 4. Thus, I agree with Judge Strand that remand is appropriate "to cure some specific defect in the administrative proceeding, such as the ALJ's failure to develop the record or to properly evaluate the evidence . . . ." *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000).

**THEREFORE,**

I accept Judge Strand's R&R, including the specific instructions for remand stated in the R&R. The Commissioner's decision is reversed and this case is remanded

for further proceedings consistent with this opinion. The Clerk shall enter judgment against the Commissioner and in favor of Henning.

**IT IS SO ORDERED**.

**DATED** this 22nd day of August, 2013.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA